Opinion filed July 7, 2023



In The

# Eleventh Court of Appeals

_____

## Nos. 11-22-00045-CR & 11-22-00048-CR

_____

**TRISTAN DUANE BELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 35th District Court**

**Brown County, Texas**

**Trial Court Cause Nos. CR28491 & CR28282**

## M E M O R A N D U M   O P I N I O N

Appellant, Tristan Duane Bell, was indicted under separate cause numbers for the offenses of aggravated assault with a deadly weapon against a family member, a first-degree felony, and injury to a disabled individual, a third-degree felony. *See* TEX. PENAL CODE ANN. §§ 22.02(b)(1), 22.04 (West Supp. 2022). The cases were consolidated for trial and, after Appellant waived his right to a jury trial, the trial court heard both cases in a unified bench trial. The trial court found Appellant guilty

of both offenses and assessed his punishment at thirty years' imprisonment for the aggravated assault with a deadly weapon conviction and ten years' imprisonment for the injury to a disabled individual conviction; the sentences were ordered to be served concurrently.

Appellant challenges his convictions in two issues: (1) the evidence is insufficient to support his conviction for aggravated assault with a deadly weapon—family violence—because evidence of serious bodily injury is lacking, and (2) the trial court erred when it admitted hearsay testimony under Rule 803(4) of the Texas Rules of Evidence. We affirm.

## I. *Factual Background*

Appellant assaulted his girlfriend, Macie Paige, during an argument they had in the apartment that they shared. Appellant struck Paige with his hands, dragged her by her hair from the bedroom to the living room, and choked her. He proceeded to hit Paige with various objects: plant pots, a wooden stand, and a jukebox. Finally, he smashed the living room television on her left foot, causing a fracture to her left foot. After doing so, Appellant stated that he was going to get a knife to cut her throat and claimed that he "didn't care about getting a life sentence."

As Appellant left the room to retrieve the knife, Paige, battered and bleeding, fled the apartment and ran to a neighbor's house. Paige and the neighbor called the police. Eventually, an ambulance transported Paige to the hospital in Brownwood.

Appellant inflicted numerous injuries upon Paige, including deep cuts and lacerations on her limbs, which required stitches, and a broken bone in her left foot. Most significantly, during the assault Appellant ripped off a medical pump that was attached to Paige's body, which administered a constant flow of medication to her. According to Paige's treating pulmonologist, Dr. Sonja Bartolome, this medication (Treprostinil) treats Paige's pulmonary arterial hypertension, a chronic illness for which Paige requires constant around-the-clock treatment. Paige's condition, if

untreated, creates a significant risk of death for her, and her medication mitigates that risk. However, because it has a short terminal half-life, any disruption in the administration of the medication to Paige's body resurrects the severe risk of death that is posed by her illness. Her medication pump is the mechanism by which her ongoing treatment is achieved.

When Paige fled the apartment, she was forced to leave behind both her medicine pump—which Appellant had physically ripped from her body—and her medication. Unfortunately, the hospital in Brownwood lacked a supply of this medication to administer to Paige. Because even a short lapse in Paige's treatment could result in her death, Paige's father retrieved her medication that same night from the apartment she shared with Appellant, with the assistance of a civil standby conducted by local law enforcement officers. Appellant's assault was the latest in an extensive history of violent, abusive incidents, including previous occurrences in which Paige was hospitalized because Appellant had ripped her medicine pump from her body.

While at the hospital, Paige was given fentanyl for her pain. Her broken left foot was placed in a stabilizing boot; she was given crutches to assist her in walking and was instructed not to put any weight on her left foot for six to eight weeks. She was also scheduled for two follow-up appointments with an orthopedic surgeon to ensure that the fracture to her left foot healed properly.

Paige testified that she left the hospital that night in a wheelchair, and that she was wheelchair-bound for several weeks, during which time she required assistance in bathing, eating, and getting to bed. When she regained her ability to walk, she needed to use crutches for about two months. At the time of the trial, over a year later, Paige testified that her left foot was still swollen and did not fit in the same sized shoe as the shoe that she wore on her right foot. She further testified that her

left foot hurts when the weather changes and that the mobility in her left foot is limited in comparison to her uninjured right foot.

Amy Murphy, the nurse practitioner who treated Paige in the hospital emergency department, testified that this type of injury can cause prolonged impairment of the use of a foot if not properly treated and rehabilitated. Dr. Marlen Strefling, the orthopedic surgeon who examined and treated Paige, testified that lack of treatment can result in the displacement of the fracture, which can cause more serious complications. Dr. Strefling further explained that even after a bone fracture heals, scar tissue that develops around the fracture can cause a loss of mobility and pain.

While on bond for having assaulted Paige, Appellant worked as a caregiver for disabled persons who lived in group homes in Brownwood. Logan Bishop also worked as a caregiver in the same group home as Appellant. Before Bishop began working as a caregiver, he met Appellant at a party; while there, Bishop overheard Appellant drunkenly brag about hitting someone who had a colostomy bag. Soon thereafter, when Bishop became employed at the same group home where Appellant worked, he realized that Appellant's boasts concerned a resident at the home: Charles Robinson.

Robinson, an elderly man with severe intellectual disabilities, was a resident at the group home during the time that Appellant worked there, and received care from both Appellant and Bishop. Bishop noticed that Robinson bore a large bruise on his chest. Although his disabilities limited his ability to speak, Robinson was able to communicate to Bishop that Appellant had caused the bruise.

## II. *Standards of Review*

### A. *Sufficiency of the Evidence*

We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the

4

standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all of the evidence admitted at trial, including improperly admitted evidence, and defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); *Brooks*, 323 S.W.3d at 899; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The evidence need not directly prove the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013)

5

(citing *Hooper*, 214 S.W.3d at 13). A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*, 214 S.W.3d at 13. Instead, the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.* Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

B. *Admission of Evidence*

We review for an abuse of discretion whether an out-of-court statement was properly admitted pursuant to an exception to the general hearsay rule. *Templeton v. State*, 629 S.W.3d 616, 625 (Tex. App.—Eastland 2021, no pet.) (citing *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008)). We will not reverse a trial court's decision to admit evidence, and the trial court does not abuse its discretion, unless its decision lies outside the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *Taylor*, 268 S.W.3d at 579. Furthermore, we will not disturb a trial court's evidentiary ruling, even if the trial court's reasoning was flawed, if it is correct on any theory of law that reasonably finds support in the record and is applicable to that ruling. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016); *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

III. *Analysis*

A. *The Evidence is Sufficient to Establish Serious Bodily Injury*

A person commits the offense of assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." PENAL § 22.01(a)(1). "The offense is elevated to first-degree aggravated assault if 'the actor uses a deadly weapon during the commission of the assault and causes serious bodily injury to a person whose relationship to or association with the defendant is described by Section 71.0021(b),

6

71.003, or 71.005, Family Code'—i.e., a family member, a member of the defendant's household, or a person with whom the defendant has a 'dating relationship.'" *Garcia v. State*, 667 S.W.3d 756, 762 (Tex. Crim. App. 2023) (citing PENAL § 22.02(b)(1)).

Thus, based on the statutory language as modified by the indictment, the State was required to prove beyond a reasonable doubt that (1) Appellant; (2) intentionally or knowingly; (3) caused serious bodily injury to Paige; (4) who was a member of Appellant's household or a person with whom he had a "dating relationship"; and (5) in doing so, he used a deadly weapon. Because Appellant only challenges the third element, our review focuses there—whether a rational factfinder could have found, beyond a reasonable doubt, that Paige suffered serious bodily injury as a result of Appellant's conduct.

The Penal Code defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." PENAL § 1.07(a)(8) (West 2021). It further defines "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

The Court of Criminal Appeals has held that, in examining sufficiency challenges that pertain to the element of serious bodily injury, the degree of risk created by the injury, or the disfiguring or impairing qualities of the injury, should be evaluated based on the magnitude of the injury when inflicted, rather than after the ameliorating effects of medical treatment. *Pruett v. State*, 510 S.W.3d 925, 929 (Tex. Crim. App. 2017). Specifically, in *Blea v. State*, the Court of Criminal Appeals noted that the definition of serious bodily injury plainly "refers to the injury caused by the offender, and it does not require consideration of any medical treatment that may have lessened the impact of the injury." 483 S.W.3d 29, 34 (Tex. Crim. App. 2016). Thus, in determining whether a bodily injury creates a substantial risk of

death, we should consider "the disfiguring and impairing quality of the bodily injury as it was inflicted on a complainant by an offender," and should "not consider the amelioration or exacerbation of an injury by actions not attributable to the offender, such as medical treatment." *Id.* at 34–35.

Moreover, expert medical testimony is not required to establish serious bodily injury. *Id.* at 35 (observing that "serious bodily injury may be established without a physician's testimony when the injury and its effects are obvious"). Indeed, an injured person's lay testimony about the seriousness of her injuries may support a finding of serious bodily injury. *See Wade v. State*, 663 S.W.3d 175, 185 (Tex. Crim. App. 2022) ("We have previously held that a lay witness's opinion testimony supported a finding of serious bodily injury. . . . '[A] person who has received injuries is qualified to express an opinion on the seriousness of those injuries.'") (citing and quoting *Hart v. State*, 581 S.W.2d 675, 677 (Tex. Crim. App. [Panel Op.] 1979)). And, the factfinder is permitted "to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence presented to it in order to conclude that a particular injury constitutes 'serious bodily injury.'" *Id.*

### 1. *Paige's Left Foot Injury Constitutes a Serious Bodily Injury*

During his assault on Paige, Appellant smashed a television on her left foot, which caused a fracture. At the hospital, Paige was diagnosed with a fractured metatarsal in her left foot, as well as surface lacerations to her left foot and both hands. She was given fentanyl for the pain. Her fractured left foot was placed in a stabilizing boot; she was also provided crutches to assist her in walking and was instructed not to put any weight on her left foot for six to eight weeks. She was also scheduled for two follow-up appointments with an orthopedic surgeon to ensure that the fracture healed properly.

Paige testified that she left the hospital that night in a wheelchair, and she was wheelchair-bound for several weeks, during which time she required assistance in bathing, eating, and getting to bed. When she regained her ability to walk, she needed to use crutches for about two months. At the time of the trial, over a year later, Paige testified that her left foot was still swollen and would not fit into the same sized shoe as the shoe that she wore on her right foot. She also experiences pain in her left foot when the weather changes and she has limited mobility in her left foot in comparison to her uninjured right foot.

Murphy testified that this type of injury can cause prolonged impairment of the use of a foot if the injury is not properly treated and rehabilitated. Dr. Strefling testified that lack of treatment can result in displacement of the fracture, which can cause more serious complications. Dr. Strefling further explained that even after a fracture heals, scar tissue that develops around the fracture can cause pain and a loss of mobility in the injured joint.

Injuries that cause prolonged impairment can support a finding of serious bodily injury. *See, e.g., Brown v. State*, 605 S.W.2d 572, 574–75 (Tex. Crim. App. [Panel Op.] 1980) (holding that a broken nose, which would have caused disfigurement and dysfunction of the nose if not set, was a serious bodily injury); *Omoleme v. State*, No. 14-20-00226-CR, 2021 WL 4956924, at *1 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (mem. op., not designated for publication) (holding that a concussion resulting in two days' hospitalization and several months of dizziness, headaches, loss of balance, and loss of vision was a serious bodily injury); *Madden v. State*, 911 S.W.2d 236, 244 (Tex. App.—Waco 1995, no pet.) (holding that a gunshot wound was a serious bodily injury when it resulted in the victim being hospitalized for one day, prevented him from walking for three to four weeks, and left permanent scar tissue).

The testimony established that Paige's fractured left foot prevented her from walking for two months and that she continued to experience pain and reduced mobility in her left foot over a year later. The medical testimony of Murphy and Dr. Strefling, although not required, further established that absent medical treatment, the fracture to Paige's left foot could have become displaced, which would have resulted in further impairment. Based on this record, we conclude that the evidence is sufficient to support the trial court's verdict that Appellant's conduct caused Paige to suffer a serious bodily injury, namely when his actions during the assault caused the fracture to Paige's left foot.

2. *Displacement of Paige's Medicine Pump Constitutes Serious Bodily Injury*

When Appellant assaulted Paige, he ripped her medicine pump from the port that was inserted in her stomach. When Paige fled the apartment, the medicine pump and medication remained there, and she was unable to bring any of her medication with her. When she arrived at the hospital in Brownwood, it was determined that the hospital did not have available the prescription medication that she was required to take. Paige's father, assisted by local law enforcement officers, went to the apartment, where Appellant remained after the assault, and retrieved Paige's medication.

Dr. Bartolome testified that Paige's chronic pulmonary arterial hypertension was severe; in her circumstance, Paige required the constant, around-the-clock administration of her prescribed medication, Treprostinil, through her medicine pump. Dr. Bartolome testified that Paige's medication had a terminal half-life of five hours and that an interruption in the administration of the medication to Paige created a high risk of death that could result in five hours or less. Dr. Bartolome further stated that she had patients who had died due to a sudden interruption in the administration of this medication.

10

We assess the evidence of serious bodily injury according to the risk created by the injury as it was inflicted, not after the harm or risk is ameliorated by medical intervention. *Pruett*, 510 S.W.3d at 929. The evidence supports the argument that Appellant's conduct created a serious risk of death for Paige when he ripped her medicine pump from her body during his assault on her. Therefore, we conclude that the evidence is sufficient to support the trial court's verdict that Appellant's conduct during the assault caused serious bodily injury to Paige. Accordingly, we overrule Appellant's first issue.

B. *Bishop's Statement is Admissible Under Rule 803(4).*

In his second issue, Appellant complains that the trial court abused its discretion when it admitted hearsay testimony under the exception for statements made for the purpose of a medical diagnosis or *treatment*. TEX. R. EVID. 803(4). In order for a statement to be admissible under Rule 803(4), it must be pertinent to a medical diagnosis or treatment. *Gutierrez v. State*, 630 S.W.3d 270, 278 (Tex. App.—Eastland 2020, pet. ref'd) (citing *Taylor*, 268 S.W.3d at 591). The State contends that Appellant did not preserve his hearsay complaint for appellate review because his objection was not timely. We agree.[1]

To preserve error for appellate review, an appellant is ordinarily required to make a timely request, objection, or motion to the trial court. TEX. R. APP. P. 33.1(a)(1)(A). An objection is timely if it is raised as soon as the ground for the objection becomes apparent; otherwise, the matter is forfeited. *Johnson v. State*, 878 S.W.2d 164, 167 (Tex. Crim. App. 1994); *see Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) ("[A] party must make the complaint at the earliest possible opportunity.").

---

[1]The challenge raised by Appellant in his second issue concerns the admission of certain evidence in Cause No. 11-22-00045-CR—the indicted offense of injury to a disabled individual. Despite Appellant's isolated evidentiary challenge, he does not challenge the sufficiency of the evidence to support his conviction for this offense.

Bishop testified that the elderly and disabled victim, Robinson, explained that Appellant had injured him. During Bishop's testimony, Appellant's trial counsel raised a hearsay objection, but only after Bishop had already answered, without objection, several of the State's questions about Robinson's statements:

Q: Did you talk to Mr. Robinson about his bruises?

A: Yes, ma'am. I actually – I was trying to ask him what happened, and for the most part, he wouldn't answer until the very end.

Q: And what did he eventually say to you?

A: Eventually said that Tristan did it – with the officer in the room.

Q: When you talked about Mr. Bell to Mr. Robinson, what was Mr. Robinson like?

A: Say that again.

Q: What was Mr. Robinson like whenever you mentioned Mr. Bell?

A: He was just very quiet. He never really said anything. He didn't want to say nothing. I did ask him at one point if he was one of the ones that was hitting him, and he told me, no, for the longest time.

[DEFENSE COUNSEL]: Objection, your honor. I'm going to object to hearsay.

The basis for the hearsay objection was apparent as soon as the State asked: "And what did he eventually say to you?" However, Appellant did not object to that question, and he did not make any hearsay objection until after the State had asked and received answers to two subsequent questions. *See Juarez v. State*, 461 S.W.3d 283, 300 (Tex. App.—Texarkana 2015, no pet.) ("If a party 'fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived.'") (quoting *Grant v. State*, 345 S.W.3d 509, 512 (Tex. App—Waco 2011, pet. ref'd). Appellant does not explain the delay in asserting his untimely hearsay objection. *See*

*id.* Therefore, we hold that Appellant's objection was untimely and the claimed error, if any, is waived. *See id.*

Nevertheless, even if Appellant had preserved this issue for our review, Bishop's statements were admissible under Rule 803(4). To be admissible under this rule, a statement must be: (1) made to a medical professional or someone who would be likely to obtain medical help for the declarant; (2) made for the purpose of diagnosis or treatment; and (3) pertinent to such diagnosis or treatment. *Taylor*, 268 S.W.3d at 586–87. The testifying witness need not have any medical qualifications under the rule. *Id.* at 587. Rather, "[t]he essential 'qualification' expressed in the rule is that the declarant believe that the information he conveys will ultimately be utilized in [the] diagnosis or treatment of a condition from which the declarant is suffering." *Id.*

While not a physician or other type of degreed medical professional, Bishop was a full-time caregiver at the group home where Robinson resided. Bishop was personally responsible for feeding Robinson, washing him, changing his clothes, administering his medications, and changing his colostomy bag. In essence, Bishop was Robinson's primary source of care while he was on duty. One could reasonably conclude that Robinson had every reason to believe that any information that he expressed to Bishop about the injuries he sustained while a resident at the group home, including their cause, would be used to diagnose or treat his injuries.

The Court of Criminal Appeals, in addressing the purpose of Rule 803(4), has suggested that the removal of a child from an abusive environment is a legitimate extension of "medical treatment" under the rule. *See, e.g.*, *Taylor*, 268 S.W.3d at 591. This rationale supports the application of Rule 803(4) here, where a vulnerable, disabled adult requires protection from an abusive caregiver in a care facility. It is reasonable to conclude that when Robinson told Bishop about Appellant's abusive

conduct, he most likely believed that doing so would result in "treatment" that included the prevention of any further abuse by Appellant.

Because the trial court could have determined that Robinson made his statement to Bishop for the purpose of improving his care and the treatment of his injuries, we conclude that the statement was pertinent to Robinson's medical situation and that Bishop was qualified under Rule 803(4) to express the statement that Robinson made to him concerning Appellant's abusive conduct. Therefore, the trial court did not abuse its discretion when it admitted Bishop's testimony regarding Robinson's statement under Rule 803(4). Accordingly, Appellant's second issue is overruled.

## IV. *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE


July 7, 2023

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

14